UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 2:24-CR-106-NT |
| | ) | |
| | ) | |
| LARRY STENDEBACH | ) | |

**DEFENDANT'S MOTION FOR**
**VARIANT SENTENCE**

NOW COMES the Defendant, by and through his undersigned counsel, and moves that this Court depart and/or sentence the Defendant below the guideline sentencing range, based upon the arguments presented below:

**I.  Introduction**

The Supreme Court in *Gall v. US*, 128 S. Ct. 586 (2007) and the First Circuit in *U.S. v. Martin*, 520 F.3d 87 (1st Cir. Mass. 2008), have established and reiterated the sentencing process we are to follow.  The sentencing determination begins with the calculation of the advisory sentencing range.  This includes the appropriateness of any recognized Guideline departures. *Martin*, at 91.  The court then hears from the parties on a proper sentence considering the case and defendant specific facts, weighing the applicability of the factors delineated in 18 U.S.C. § 3553(a). *Id.*  The final sentence rests with the explained determination of the court. *United States v. Jimenez-Beltre*, 440 F.3d 514, 518-19 (1st Cir. 2006).  A sentencing judge may additionally reject the Guideline range on the basis of a policy disagreement with the Guidelines. *U.S. v. Spears,* 129 S. Ct. 840, 844 (1/21/09); *United States v. Boardman*, 528 F.3d 86, 87 (1st Cir. 2008).  On review, *Gall* directs the circuit to look to the procedural soundness and substantive reasonableness of the sentence. *U.S. v. Thurston*, 544 F.3d 22, 24-25 (1st Cir.  2008) citing *Gall*, 128 S. Ct. at 597 and *Martin* at 92.  Review of substantive reasonableness is for "abuse of discretion." *Thurston* at 25; citing *Gall* at 591.

The Defendant's motion will assist the Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) in light of *United States v. Booker*, 125 S. Ct. 738 (2005). *Booker* restored the district courts' ability to fashion a sentence tailored to the individual circumstances of the case and defendant by requiring courts to consider factors other than the sentencing range prescribed by the United States Sentencing Guidelines. Indeed, under Section 3553(a), courts are *required* to sentence below the range if such a sentence would be sufficient to achieve the purposes of punishment.

In preparation for such consideration by the Court, the Defendant respectfully requests that the Court consider several important circumstances of this case in recommending an appropriate sentence. The sentencing guideline range is no longer binding on the Court, but is only one of five factors to be considered in determining the sentence. *Booker*, 125 S. Ct. at 764-65. In accordance with the ruling in *Booker*, a "court in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that *imprisonment is not an appropriate means of promoting correction and rehabilitation*." 18 U.S.C. § 3582(a) (emphasis supplied); 28 U.S.C. § 994(j); *See also U.S. v. Booker*, at 757, 764, 766, 767, 768.

## II.    Numerous Courts Have Recognized The Need To Issues Variant Sentences In Same Or Similar Cases

There is no dispute that a district court can vary, even dramatically, from a guideline sentencing range based on the factors enumerated in § 3553(a). *U.S. v. Crespo-Rios,* 787 F.3d 37 (1st Cir. 2015)*; citing Gall,* 552 U.S. at 49-50, 128 S.Ct. 586. In recognizing this principle, there

are numerous courts that have issued variant sentences in cases similar to the one presented in this matter.

In *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017), the Second Circuit vacated and remanded the defendant's 225-month sentence for possession and transportation of child pornography. Notwithstanding the fact that the sentence imposed was within the properly calculated guideline range, the court held that the term of imprisonment was "shockingly high" and the conditions of the 25-year term of supervised release were "excessively severe." The court cited prior circuit decisions emphasizing that district courts must take particular care to reconcile sentences under §2G2.2 with the factors set forth in 18 U.S.C. § 3553(a) because the guideline has been developed "at the direction of Congress" rather than by the expertise of the Sentencing Commission. The court noted that the sentencing range produced by §2G2.2 approached the statutory maximum and failed to distinguish between the most dangerous defendants and others. The Second Circuit determined that the district court's failure to consider these concerns resulted in a substantively unreasonable sentence.

In *United States v. Dorvee*, 616 F.3d 174, 184, 188 (2d Cir. 2010), the Second Circuit vacated the within-guideline sentence of 20 years, finding it procedurally and substantively unreasonable. The court found that §2G2.2 is "fundamentally different" from most other guidelines and that "unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." Although the guidelines are typically developed by the Commission using an empirical approach based on data about past practices, the court stated that the Commission did not use that empirical approach for this guideline when it amended the guideline at the direction of Congress. The court stated that in keeping with Kimbrough, "a district court may vary from the [g]uidelines range based solely on a policy disagreement with the [g]uidelines, even where that disagreement applies to a wide class of offenders or offenses."

3

Further, it encouraged district courts to take their broad discretion seriously when reaching sentencing decisions under §2G2.2 because it is "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results."

In *United States v. Grober*, 624 F.3d 592 (3d Cir. 2010), the Third Circuit found a below-guideline sentence of the statutory minimum for receipt of child pornography to be procedurally reasonable because Kimbrough permits a court to vary even when a guideline is a direct reflection of a congressional directive. Although the guidelines deserve careful consideration and cannot be ignored when produced at the direction of Congress, the court found it was not an abuse of discretion for the district court to vary because it set out sufficiently compelling explanations to justify its below-guideline sentence. The sentencing court relied on Troy Stabenow's Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines and other district court opinions expressing concern for the child pornography guidelines based on Congress' role in their development. The Third Circuit stated that the Commission's subsequent History of the Child Pornography Guidelines report from 2009 further supported the district court's decision because it demonstrated the role Congress has played in the development of the child pornography guidelines.

Also, for example, in *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) the Ninth Circuit affirmed a downward variance from a guideline range of 41–51 months to 5 years' probation in possession of child pornography case based in part on finding that the defendant did not fit the profile of a pedophile, had no history of substance abuse, no interpersonal instability, was motivated and intelligent, and had the continuing support of his family. The Defendant fits the same profile.

### III.    The Impact Of The Sentencing Commission's Report to Congress

In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. See U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012) ["Child Porn Report"]. The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," id. at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." Id. at ii, 323.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." Id. at iii, xi; id. at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." Id. at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," id. at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," id. at 323. The cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." Id.

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." Id. at 79. It reported that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" id. at 278 & n.31 (quoting Center of Sex Offender Management, The Comprehensive Approach to Sex Offender Management 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." Id. at 282.

The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." Id. at 104. Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. Id. at ix-x, 204-05. However, "the current guideline measures for offender culpability (e.g., for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." Id. at 204.

The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." Id. at xx; see also id. at 321. The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." Id. at xviii, 322.

IV.    **Seriousness Of The Offense**

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters. Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers. Aside from the lack of evidence to support this belief in general, see Child Porn Report at 104 (confirming that "not all child pornography offenders are pedophiles or engage in other sex offending"). The Defendant has not been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at no risk of harming a child. This distinguishes the Defendant from the offenders Congress had in mind, and is therefore highly relevant. See *United States v. Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) (rejecting presumption that "those who view child pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that viewing child pornography does not equate to child molestation"); *United States v. Kelly*, 868 F. Supp. 2d 1202, 1207-08 (D.N.M. 2012) (rejecting government's argument that guideline range is appropriate because of the "chance that [defendant] will molest children in the future, or that he has in the past," as this "speculation is directly contrary to submissions by Kelly's therapist and Kelly's psychiatrist," the defendant "has never been accused of hands-on abuse," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a

reliable basis."); *United States v. Grober*, 595 F. Supp. 2d 382, 404 (D.N.J. 2008) ("[T]he Court cannot make [Defendant] a surrogate for the monsters who prey on child victims through actual contact."), aff'd 624 F.3d 592 (3d Cir. 2010).

The Commission confirms that the possession of even large numbers of images, including sado-masochistic images, is "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Child Porn Report* at 204. In addition, technology has changed the nature of this offense. In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money, whereas today, images of child pornography are available for free in the privacy of one's home, with no planning and minimal effort. As a result, less dangerous people commit this offense than was previously the case, even though the guideline range is much higher than it was previously.

Before widespread dissemination on the Internet, only those bold enough to seek out child pornography by contacting suppliers directly or through the mail were able to obtain it. In 1994 and 1995, the government prosecuted a total of only 90 defendants convicted of possessing, receiving, or distributing child pornography, and only 24% used a computer. See U.S. Sent'g. Comm'n, Report to the Congress: Sex Crimes Against Children 29 (1996) [U.S. Sent'g Comm'n, 1996 Report]. In 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer. U.S. Sent'g. Comm'n, Use of Guidelines and Specific Offense Characteristics (2011); U.S. Sent'g Comm'n, 2011 Sourcebook of Federal Sentencing Statistics, tbl.17.

The Internet, by rendering child pornography immediately and anonymously accessible, has "facilitate[d]. . . a new kind of crime" that in most cases would not otherwise have been committed. See Andreas Frei et al., Paedophilia on the Internet—A Study of 33 Convicted Offenders in the Canton of Lucerne, 135 Swiss Med. Weekly 488, 492 (2005); see also Jérôme

Endrass et al., The Consumption of Internet Child Pornography and Violent Sex Offending, 9

BMC Psychiatry 43, 44 (2009); L. Webb et al., Characteristics of Internet Child Pornography

Offenders: A Comparison with Child Molesters, 19 Sexual Abuse 449, 450 (2007). In short, the

change in technology is relevant, in part, because it means that even as the population of child

pornography offenders has become less dangerous, punishment has greatly increased. See

Richard Wollert, PhD, The Implication of Recidivism Research and Clinical Experience For

Assessing and Treating Federal Child Pornography Offenders: Written Testimony Presented to

the U.S. Sentencing Commission at 4-5 (Feb. 15, 2012).

The enhancements for material involving prepubescent minors, material depicting

sadistic or masochistic conduct, use of a computer, and number of images apply in nearly every

case sentenced under § 2G2.2. In fiscal year 2011, 95.3% of defendants received the 2-level

enhancement for material involving prepubescent minors; 79.4% received the 4-level

enhancement sadistic or masochistic material; 97.4% received the 2-level enhancement for use of

a computer"; and 96% received at least a 2-level enhancement based on the number of images,

with most (70.9%) receiving the 5-level enhancement for 600 images or more. U.S. Sent'g

Comm'n, Use of Guidelines and Specific Offense Characteristics (2011)

As many courts have observed, the child pornography guideline, by enhancing sentences

based upon factors that are inherent in the crime and thus appear in nearly every case,

concentrates offenders at or near the statutory maximum and thus fails to meaningfully

distinguish more serious offenders from less serious offenders. As the Sixth Circuit has

observed, sentences at or near the statutory maximum should be reserved for the "worst possible

variation of the crime" committed by the most dangerous offender. See *United States v. Aleo*,

681 F.3d 290, 302 (6th Cir. 2012); cf. *United States v. Poynter*, 495 F.3d 349, 354 (6th Cir.

2007) ("not all repeat sex offenders deserve" to be sentenced at the statutory maximum; "otherwise, Congress would not have set a statutory range of 0-60 years").

## V.    It is Unlikely Mr.  Will Offend Again

The Defendant will be 60 years old at the time of sentencing.  By reviewing the Defendant's individual characteristics, it becomes evident that it is unlikely that the Defendant will engage in criminal behavior again. Mitigating factors that were previously discouraged except under certain circumstances or for certain purposes should be considered more broadly to the extent they bear on the sentencing considerations found in Section 3553(a). See *United States v. Nellum*, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005). In *United States v. Nellum*, the court took into account the fact that the defendant, who was 57 at sentencing, would upon his release from prison, have a very low likelihood of recidivism. Id. at 9. In fact, the court based its decision on recidivism studies that had been conducted, and relied upon by the Sentencing Commission. Id. at 9; citing, U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12. In fact, the court indicated that according to a United States Sentencing Commission Report released in May, 2004, "Recidivism rates decline consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates." Id. at *9; citing, U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12. As indicated by the court in *Nellum,* "the positive correlation between age and recidivism is impossible to deny." Id. *9.

In addition to *Nellum*, other cases in which courts have declined to impose Guidelines sentences on defendants who, like Carmona-Rodriguez, were over the age of forty on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants. *United States v. Carmona-Rodriguez*, 2005 U.S. Dist. LEXIS 6254 (S.D.N.Y. Apr. 11, 2005); citing, *Simon v. United States*, 2005 U.S. Dist. LEXIS 4551 (E.D.N.Y.

10

Mar. 17, 2005) (imposing a term of incarceration of 240 months on a 43-year-old defendant where the Guidelines recommended a minimum of 324 months). Therefore, the statutory factors under § 3553 do justify a sentence that varies with the advisory sentencing range set forth in the Guidelines, and demonstrates substantial justification for the Court to consider alternative sentencing approaches, including a variance because it is unlikely that the Defendant will commit an offense again.

According to the Commission, recidivism rates in general (defined to include technical supervised release violations) "decline relatively consistently as age increases," from 35.5% for offenders under age 21, down to 12.7% for offenders age 41 to 50, and down to 9.5% for offenders over age 50. U.S. Sent'g Comm'n, Measuring Recidivism at 12 & Exh.9. For sex offenders, too, recidivism declines with age, and only a very few child sex offenders recidivate after age 60. See R.K. Hanson, Recidivism and Age: Follow-up Data from 4,673 Sexual Offenders, 17 J. Interpers. Violence 1046, 1054 (2002).

In addition, for sex offenders, cognitive behavioral therapy substantially reduces recidivism. U.S. Dep't of Justice, Center for Sex Offender Management, Understanding Treatment for Adults and Juveniles Who Have Committed Sex Offenses 10 (2006). As the Commission reports, recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant'" Child Porn Report at 278 & n.31 (citing a project funded by the Department of Justice). As discussed by Dr. Donnelly, Mr. is a great candidate for sex offender treatment.  See *Report of Dr. Peter Donnelly, Psy. D*.

In short, the Defendant's entire lack of criminal history, age, long marriage, family support, education and gainful employment until his retirement, and candidacy for behavioral therapy strongly support the conclusion that he is most unlikely to re-offend.  The Defendant has also experienced a spiritual rebirth.  The metamorphosis and the Defendant's rededication to his

11

faith is uncanny.  The Defendant feels that he has a calling to the ministry and the Christian faith, to the degree that he assists other inmates with various addictions and conduct problems.  The rededication to faith will serve as the bedrock for stability for the Defendant going forward, and is significant evidence that the Defendant is unlikely to reoffend in the future.  The sentence should reflect the fact that Congress's contrary assumption is unfounded in this case. All of the evidence indicates that the Defendant will never view child pornography, or reoffend, again.

### VI.    Other Factors Offsets The Need For Extended Jail Sentence

Since the inception of the guidelines, the Commission has acknowledged that home confinement is a "form of punishment" that may be "equally efficient" as incarceration for an elderly and infirm defendant. USSG § 5H1.1. Indeed, the same prison sentence for an older offender amounts to harsher punishment than that for a young or middle-aged offender, because the sentence is a greater proportion of an older offender's remaining life and can amount to a life sentence. See Hannah T.S. Long, The "Inequality" of Incarceration, 31 Colum. J. L. & Soc. Probs. 321, 343-44 (1998) (suggesting that prison sentences be adjusted for life expectancy due to age and illness).

For example, the three-year prison sentence that Brian Gall was facing in his mid-twenties that the district court reduced to probation, see *Gall*, 552 U.S. at 41-45, pales in comparison to a similar sentence for a defendant like Mr.  who is 65 years old. Offenders' health problems before and during incarceration "accelerate their aging processes to an average of 11.5 years older than their chronological ages after age 50." U.S. Dep't of Justice, National Institute of Corrections, Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates, at 10 (2004), available at hwww.nicic.org/pubs/2004/018735.pdf.

Offenders who committed their first crime after the age of 50 "have problems adjusting to prison since they are new to the environment, which will cause underlying stress and probable stress-related health problems," and they are "easy prey" for more experienced inmates. Id. at 10. For older prisoners who are unfamiliar with prison culture, "the prison sentence represents nothing short of a disaster, a catastrophe, and, in consequence, they are often in a psychological state of trauma." Elaine Crawley & Richard Sparks, Older Men in Prison: Survival, Coping, and Identity, in The Effects of Imprisonment 343, 346-47 (Alison Liebling & Shadd Maruna eds., 2005).

The Defendant must register as a sex offender, with the publication of that information to the community and his friends and neighbors. As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. See, e.g., *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," id. § 3553(a)(2)(A), and "adequate deterrence," id. § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the history and characteristics

13

of the defendant," the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence").

Significant increases in terms of supervised release also offsets the need for an extended jail sentence in this case.  The PROTECT Act of 2003 significantly increased supervised release terms in child pornography cases. For child pornography offenses committed before the enactment of the PROTECT Act, supervised release was governed by 18 U.S.C. § 3583(b), the general provision applicable to all federal offenses not carrying mandatory supervised release terms. See 18 U.S.C. § 3583(b); see also *United States v. Rivera-Maldonado*, 560 F.3d 16, 18 n.1 (1st Cir. 2009).  Section 3583(b) has no minimum term and one- to five-year maximum terms depending on the class of felony of which an offender was convicted.

Before the PROTECT Act, all child pornography offenders without predicate convictions for sex offenses could be sentenced to a maximum of three years of supervised release because their offenses were either Class C or D felonies. See 18 U.S.C. §§ 3559(a) & 3583(b)(2). Before the PROTECT Act, production offenders without a predicate conviction for a sex offense were subject to a statutory maximum of 20 years of imprisonment and non-production offenders without predicate convictions faced five- or 15-year statutory maximum terms of imprisonment. See Chapter 1 at 4 n.26 (noting that, in cases of offenders without predicate sex convictions, pre-PROTECT Act statutory maximum terms of imprisonment were five years for possession offenses, 15 years for R/T/D offenses, and 20 years for production offenses). Except for offenders convicted of simple possession, child pornography offenders with predicate convictions for sex offenses, who were all Class B felons, could receive a maximum of five years of supervised release. See 18 U.S.C. § 3583(b)(1). Simple possession offenders with predicate convictions, who were class D felons, could receive three-year maximum terms of supervised release. See 18 U.S.C. § 3583(b)(2).

14

For offenses committed after the PROTECT Act, every child pornography offender sentenced to any amount of imprisonment for conviction of an offense in chapter 110, title 18, of the United States Code, must serve a mandatory minimum term of five years of supervised release and can be sentenced up to a maximum term of lifetime supervision. See 18 U.S.C. § 3583(k); see also *United States v. Presto*, 498 F.3d 415, 417–18 (6th Cir. 2007) (discussing the PROTECT Act's amendment to § 3583(k)).

Both before and after the PROTECT Act, provisions in the sentencing guidelines concerning supervised release have instructed judges to impose at least the statutory minimum term and — as a policy statement — have "recommended . . . the statutory maximum term of supervised release" for all defendants convicted of "a sex offense." The guidelines, consistent with the statutory definition in 18 U.S.C. § 3583(k), have defined "sex offense" to include all child pornography offenses in 18 U.S.C. §§ 2252 & 2252A. As noted above, the PROTECT Act expanded the statutory maximum term of supervised release to lifetime supervision for all child pornography offenders. Therefore, the current guideline effectively recommends a lifetime term of supervised release for all child pornography offenders.

Certainly, it is likely that the Defendant will receive a lifetime term of supervised release as a component of his sentence in this case. In fact, the Defendant invites such. A significant period of supervised release obviates the need for an extended jail sentence in this case.

## VIII. Conclusion

As demonstrated above, other significant mitigating factors warrant consideration by this Court in determining an appropriate sentence. For the above-mentioned reasons, the Defendant submits that: (1) a sentence within the Guideline sentencing range would be contrary to the statutory mandate that the court impose a sentence sufficient but not greater than necessary, to

15

comply with the purposes of sentencing; (2) the characteristics of the Defendant and other circumstances warrant a variant sentence. The Defendant should receive a sentence of fifteen (15) years confinement, and term of supervised release as determined by the Court.

Dated at Portland, Maine this 3rd day of September, 2025.

/s/ Roger F. Brunelle Jr.
Roger F. Brunelle Jr., Esquire
Attorney for Defendant
LAW OFFICES OF ROGER F. BRUNELLE, JR.
One Monument Way, 2nd Floor
Portland, ME 04101
(207) 699-4357
roger@rbrunellelaw.com

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2025, I electronically filed Defendant's Motion for Variant Sentence with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Peter Brstowin, Esq.
Assistant U. S. Attorney
U.S. Department of Justice
U.S. Attorney's Office
100 Middle Street,
East Tower, 6th Floor
Portland, ME 04104-5018

Respectfully submitted,

/s/ Roger F. Brunelle Jr.
Roger F. Brunelle Jr., Esq.

16